# In the United States Court of Federal Claims

No. 09-363C
(Filed: October 15, 2014)

* * * * * * * * * * * * * * * * * * * *

LAKE CHARLES XXV, LLC,

      *Plaintiff*,

v.

THE UNITED STATES OF AMERICA,

      *Defendant.*

Contract Disputes Act; Excusable delay; Notice of delay; Waiver; No-waiver clause; Bad Faith

* * * * * * * * * * * * * * * * * * * *

    *Clinton Meyering*, Taylor, MI, for plaintiff.

    *Jeffrey D. Klingman*, United States Department of Justice, Civil Division, with whom were *Steven J. Gillingham*, Assistant Director, *Bryant G. Snee*, Acting Director, and *Stuart F. Delery*, Assistant Attorney General, Washington, DC, for defendant.

BRUGGINK, Judge.

## OPINION

    This is a breach of contract case brought pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101-7109 (2012). The case concerns a contract to design, build, and then lease to the government an office building in Louisiana. Plaintiff is appealing the Contracting Officer's ("CO") decision to terminate the contract for default. Defendant counterclaimed, asking the court to award it reprocurement costs and liquidated damages for the delay in project completion. Defendant moved for partial summary judgment that the termination for default was proper because plaintiff's delays were not excused and because plaintiff's bad faith claim is unfounded. Plaintiff cross-moved for summary judgment that the termination was wrongful because all of the delays were beyond its control and because defendant had an ulterior motive for

terminating the contract. The motions are fully briefed. We heard oral argument on May 7, 2014, during which we asked for supplemental briefing on a question raised for the first time during oral argument. Because plaintiff's delays were not excused and because there is no evidence of bad faith, we grant defendant's motion for partial summary judgment and deny plaintiff's cross-motion.

BACKGROUND

The General Services Administration ("GSA") awarded contract GS-07B-16093 to Carotex Development, Inc. ("Carotex") on May 31, 2006. Carotex agreed to design, build, and then lease to GSA a 12,733 rentable-square-feet office building in Lake Charles, Louisiana for use by the Social Security Administration ("SSA"). The specifications for the building exterior and the general floor plan were agreed upon and set forth specifically in the lease. The design and construction of much of the interior, especially improvements and finish elements, was anticipated by the parties to be a more iterative process.

The contract listed six steps for the design and construction of the more specific interior elements, which it termed "tenant improvements:" (1) the government would generate initial design intent drawings; (2) the government would finalize the design intent drawings and provide them to the lessor (contractor); (3) the lessor would create final working/construction drawings of the interior improvements in conformance with the design intent drawings; (4) the government would review the drawings, request any modifications, approve the drawings, and issue to the lessor the notice to proceed; (5) the lessor would construct the tenant improvements; (6) the government would inspect and then accept or reject the space. Def.'s App. 24 (solicitation for offers incorporated into the final contract).[1]

The design intent drawings ("DIDs") were "fully-dimensioned drawings of the leased space" and included information regarding finish elements such as furniture locations, telephone and data outlet locations, specifications for electrical and HVAC loads, and other "finish/color/signage selections." *Id.* This information was used by the lessor to prepare the construction drawings,

---

[1] "Def.'s App." refers to the appendix of documents submitted by defendant in support of its motion for partial summary judgment. It is paginated consecutively through all of the documents.

which added all of the "mechanical, electrical, plumbing, fire safety, lighting, structural, and architectural improvements scheduled for inclusion" into the building. *Id.* Once the construction drawings were approved by GSA, it was to issue a notice to proceed, which would instruct the lessor to "obtain the necessary permits and . . . commence construction of the space." *Id.*

In a separate, earlier section, the contract stated that the parties would incorporate the final DIDs into the contract by a Supplemental Lease Agreement ("SLA"). *Id.* at 3 (paragraphs 13 and 14). This would begin a 180-day clock for completion of construction and delivery of the building to GSA/SSA. *Id.* After completion, the government would inspect the building, and, upon acceptance, the lease portion of the contract would begin with an annual rent of $287,766 for the first 10 years and $271,850 for five option years.

The lease incorporated by reference 48 C.F.R. § 552.270-18, the FAR's default-in-delivery clause for GSA leases.[2] It provides in relevant part:

> (a) With respect to Lessor's obligation to deliver the premises substantially complete by the delivery date, time is of the essence. If the Lessor fails to work diligently to ensure its substantial completion by the delivery date or fails to substantially complete the work by such date, the Government may by notice to the Lessor terminate this lease. . . . The Lessor and the Lessor's sureties, if any, are jointly and severally liable for any damages to the Government resulting from such termination, as provided in this clause. . . .
>
> . . . .
>
> (d) The Government shall not terminate this lease under this clause nor charge the Lessor with damages under this clause, if (1) the delay in substantially completing the work arises from excusable delays, and (2) the Lessor within 10 days from the beginning of any such delay (unless extended in writing by the Contracting Officer) provides notice to the Contracting Officer

---

[2] "FAR" refers to the Federal Acquisition Regulation codified at title 48 of the Code of Federal Regulations. The provisions that deal specifically with clauses to be added to GSA contracts are also referred to as the "GSAR."

> of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of delay. If the facts warrant, the Contracting Officer shall extend the delivery date, to the extent of such delay at no additional costs to the Government. A time extension is the sole remedy of the Lessor.

48 C.F.R. § 552.270-18 (2014).[3] "Notice" is defined in the same FAR clause as "written notice sent by certified or registered mail, Express Mail or Comparable service, or delivered by hand. Notice shall be effective on the date delivery is accepted or refused." *Id.* § 552.270-4(j).

The lease also incorporated a clause defining "excusable delays" as

> (g) . . . delays arising without the fault or negligence of Lessor and Lessor's subcontractors and suppliers at any tier, and shall include, without limitation:
>
> > (1) acts of God or of the public enemy,
> > (2) acts of the United States of America in either its sovereign or contractual capacity,
> > (3) acts of another contractor in the performance of a contract with the Government,
> > (4) fires,
> > (5) floods,
> > (6) epidemics,
> > (7) quarantine restrictions,
> > (8) strikes,
> > (9) freight embargoes,
> > (10) unusually severe weather, or
> > (11) delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Lessor and any such subcontractor or supplier.

*Id.* § 552.270-4(g).

---

[3] The omitted portions go on to more specifically detail what constitutes reprocurement costs to which the government would be entitled in the event of a delivery default.

On February 15, 2007, GSA issued the DIDs to Carotex. The parties did not, however, incorporate those drawings into the contract through an SLA. On May 7, 2007, Carotex, GSA, and Lake Charles XXV, LLC ("Lake Charles") entered into Supplemental Lease Agreement No. 1 to substitute Lake Charles for Carotex.[4] Then, on August 6, 2007, GSA issued the notice to proceed to Lake Charles. Def.'s App. 232. Contrary to the schedule as laid out by the contract, this was before Lake Charles generated and the government accepted the construction drawings. The record is silent as to the omission of those steps prior to GSA's issuance of the notice to proceed.

Shortly thereafter, in September 2007, the parties held a meeting to discuss various projects for which Carotex was the general contractor, including the Lake Charles project. Among the topics discussed were options for terminating the parties' relationship amicably through sale of the contract to a third party. *See id.* at 233 (Letter of September 12, 2007 from Carotex to GSA regarding sale of the lease). That discussion did not stop the project from proceeding, however, and Lake Charles provided a proposed schedule on September 19, 2007. The schedule called for ultimate completion and delivery by February 28, 2008. It also provided for Lake Charles to obtain city construction permits by October 12, 2007. *See id.* at 236.

Lake Charles proceeded in an effort to obtain necessary permits, but in an October 9, 2007 letter to plaintiff's architectural subcontractor, the Fire Marshal notified plaintiff of deficiencies that required correction before a permit would be issued. *Id*. at 267-71.

Apparently undeterred by the permitting problems, the parties adopted the schedule proposed by Victor Blackmon, a principal of Carotex and Lake Charles, by executing SLA No. 2 on November 8, 2007. The new official schedule promised a GSA site visit to inspect the concrete pour on November 17, 2007, and maintained the delivery date of February 28, 2008. *Id.* at 272 (SLA No. 2). GSA committed to seven site visits to inspect various steps in the construction process, the last of which was to be the smoke alarm inspection on February 6, 2008. *Id.* SLA No. 2 reaffirmed the requirements of the default in delivery clause incorporated by reference and stated, "[i]f progress is not made and the Lessor fails to prosecute the work with the diligence that will ensure its substantial completion by the delivery date or

---

[4] Carotex and Lake Charles share common ownership, and GSA continued to deal with the same individuals after the contract transfer.

fails to substantially complete the work by such date, the Government may by notice to the Lessor terminate this lease." *Id.* at 273.

Manuel Montoya, GSA Project Manager, conducted the first site visit on December 3, 2007, and found that no construction activity had taken place, not even the concrete slab pour scheduled for November 17, 2007. As a result, GSA sent a cure notice to Mr. Blackmon, dated December 10, 2007, in which GSA warned plaintiff that it was in danger of violating the default delivery clause and that GSA was considering terminating plaintiff for default. Plaintiff was instructed to "present, in writing, any facts bearing on the question to Nancy Lopez, Contracting Officer, . . . within 10 days after receipt of this notice. Failure to present any excuses within this time may be considered as an admission that none exist." *Id.* at 285 (December 10, 2007 cure notice).

John Kimbrough of Lake Charles responded by letter to the CO, Nancy Lopez, on December 20, 2007.[5] The letter claimed 56 days of rain-related delay. Plaintiff also claimed an unspecified amount of permitting delay, stating that the city of Lake Charles gave permission for ground work, including the concrete pour, but that vertical construction was not yet approved by the Fire Marshall. The letter concluded by promising that "a schedule update based on the above facts will be produced over the holidays and forwarded to you." Def.'s App. 288 (December 20, 2007 letter from Lake Charles to GSA). That promise was not kept.

Mr. Kimbrough provided another update to GSA by letter to Ms. Lopez on January 24, 2008. The letter stated that plaintiff had completed preliminary pad and site work, but rain had brought work to a standstill, preventing addition of the last six inches of fill dirt. This was impossible, according to Mr. Kimbrough, because the fill pit was too wet to be of use until it dried out. Once the pit was back in service, the fill could be completed and the frame for

---

[5] Mr. Kimbrough sent the letter to Ms. Lopez as an attachment to an email. Also included in that email were pictures, dated December 17, of ground/site work in preparation for vertical construction. The email also stated that "[w]e need to know who is going to pull the contractors license on this site, so we can start getting electricians and plumbers signed and on site right after Christmas." Pl.'s Ex. N. It is unclear from the email who he was referring to by the pronoun "we," but it suggests that, as of December 20, Lake Charles did not yet have some of its subcontractors in place to begin construction.

6

the slab laid.  In anticipation of that work being completed, the letter stated that Lake Charles had ordered the building to be placed on the pad.  Pl.'s Ex. N.[6]  Mr. Kimbrough's letter concluded that he would provide a further update in the next week.

An internal government email chain updating various SSA and GSA officials on the status of the Lake Charles and other Carotex-associated projects, dated February 15, 2008, summarized the Lake Charles situation and the lack of progress, while reflecting that the CO would request further documentation in support of plaintiff's claim of delay.  The estimated completion date was August 2008 with SSA occupancy in September 2008.  Pl.'s Ex. H.

Referencing a site visit conducted on March 6, 2008, GSA sent Mr. Blackmon a second show cause notice by letter dated March 13, 2008. In it, GSA stated that the March 6 inspection revealed "no completed work" at the site and that "no letter of delay or revised dates [had been] received from Lake Charles." Def.'s App. 293.  The letter noted that Lake Charles had missed the delivery date and failed to respond to several inquiries made by the CO in January 2008 after plaintiff's promise to send an updated schedule. The letter informed plaintiff that GSA was considering terminating the contract for default and instructed Lake Charles to submit in writing within 10 days any facts bearing on the question of whether the delays were plaintiff's fault.

On March 20, 2008, Lake Charles received the permit from the city to begin vertical construction.  Mr. Blackmon responded to the GSA cure notice shortly thereafter by letter, claiming that Lake Charles had experienced, "no less than 65 days of excusable delay of which GSA had actual notice." Def.'s App. 298 (March 24, 2008 letter from Lake Charles to GSA).  Mr. Blackmon further referenced the December 20, 2007 letter in which Mr. Kimbrough had informed GSA of 56 days of weather-related delay.  The letter does not explain how or when the additional nine days of delay arose. The March 24 letter went on to remind GSA of Lake Charles' efforts to obtain necessary permits, citing a wait of more than four months to obtain the Fire Marshall's approval.  *Id.*  Mr. Blackmon rejected GSA's assertion that Lake Charles had failed to provide lease-required updates at 30, 60, and 90 percent project completion

---

[6] "Pl.'s Ex." refers to exhibits attached to plaintiff's Response and Cross-Motion for Summary Judgment.  Each document is paginated individually.

because the project was only at an estimated 19 percent state of completion. *Id.* at 299. As to Lake Charles' alleged failure to hold bi-weekly telephone conferences and submit other informal updates, Mr. Blackmon listed several attempts to set up conference calls, which allegedly were met with silence from GSA, and a January 28 update provided to GSA by letter.[7] The letter closed with a statement of plaintiff's disappointment in GSA's management of the project and cited GSA's failure to execute an SLA incorporating the DIDs. Attached to the letter was an updated schedule that reflected delivery of the building on August 21, 2008. *See id.* at 301-302 (revised construction schedule attached to March 24 letter).

Rather than accept the August completion date, GSA terminated plaintiff for default by letter dated June 5, 2008, citing GSA regulation 552.270-18 (48 C.F.R. § 552.270-18), incorporated into the contract by reference. The termination notice listed the failure to meet deadlines agreed to in SLA No. 2.[8] It also noted that the CO had sent the Notice to Proceed on August 6, 2007, almost a year before Lake Charles' latest proposed completion date. The CO further stated that she had considered Mr. Blackmon's March 24 response to the cure notice but found it insufficient to establish excusable delay. Def.'s App. 307-12. The notice warned plaintiff that the government was entitled to the difference in rent and other costs if the replacement lease was more expensive, along with administrative costs for reprocurement. Def.'s App. 311.

In response, Lake Charles submitted a certified claim to the CO, dated July 29, 2010. In it, plaintiff claimed the termination for default was wrongful for three reasons: (1) the government delayed in providing DIDs, the final of which were provided 246 days after contract award; (2) GSA exercised bad faith by enticing plaintiff to enter into a no cost termination in September 2007, and, when plaintiff did not agree, demanding an unreasonably short construction schedule; and (3) plaintiff experienced 84 days of rain delay. *See* Def.'s App. 313-15. Plaintiff claimed $2,877,660 in unpaid rent for the first

---

[7] Mr. Blackmon may have been referencing the letter from Mr. Kimbrough to Nancy Lopez that was dated January 24, but the record is not clear.

[8] The notice also listed as a reason for termination a failure to complete the project within 180 days after the DIDs were incorporated by SLA. We note that this was an invalid basis for termination because the DIDs were never incorporated by SLA into the contract.

ten years of the lease and $2,877,660, the residual value of the property if the building been finished.

The CO denied the claim by written decision on May 20, 2011. She rejected the claim for delay in providing the DIDs because plaintiff entered into SLA No. 2 after the date at which it alleged the government should have provided the DIDs, thereby agreeing to a new schedule and waiving any delay claim. The CO rejected the allegation of bad faith arising out of the government's proposal of a no cost termination because (1) it occurred prior to the execution of SLA No. 2 and was thus waived, (2) the offer of an amicable no-cost termination is permitted by law, and (3) the construction schedule entered into after the September 2007 meeting was developed and proposed by plaintiff. The allegation of weather delays was denied because delays prior to November 7, 2007, were waived by execution of SLA No. 2 and because plaintiff failed to follow the contract's excusable delay clause, which requires proof that the weather was "severe" and that it actually prevented Lake Charles from working on the project. The CO also noted that plaintiff's communiques regarding weather delay lacked any supporting information and none were submitted within the contractual notice period. The CO noted that the government would be assessing reprocurement costs and liquidated damages.

Plaintiff filed suit here on June 4, 2009. It simultaneously filed three other complaints involving similar contracts won by Carotex, or associated companies, and terminated by the government for default. *See Am. Govt. Props. & New Iberia SSA, LLC v. United States*, No. 09-131C; *Am. Govt. Props. & Houma SSA, LLC v. United States*, No. 09-153C; *Terrytown SSA, LLC v. United States*, No. 09-364. Two of those complaints have been dismissed because plaintiff ran afoul of the Contract Act's prohibition against assignment of contracts. *See Am. Govt. Props. v. United States*, No. 09-153C, 2014 WL 4248193 (Fed. Cl. Aug. 28, 2014); *Am. Govt. Props. v. United States*, No. 09-153C (Fed. Cl. Aug. 28, 2014) (order granting defendant's motion to dismiss).

The complaint in this action, as amended on June 16, 2011, contains three counts. The first is that the termination was wrongful because GSA did not account for its own failure to timely submit final DIDs and because it failed to account for the permitting and weather delays for which plaintiff was not responsible. The second count is that GSA breached the lease by delaying the DIDs and failing to consider the other delays to have been excused. The third and final count alleges bad faith on the part of GSA as evidenced by the

9

above referenced conduct and due to an abdication by the CO of her duties. The government answered and has counterclaimed for its costs in procuring a new facility, the difference between the costs of the old project and the new facility, and liquidated damages for the delay in completion of the SSA facility.

Defendant now asks for summary judgment that the termination was proper and that GSA did not act in bad faith. Defendant argues that plaintiff's delay claims are unfounded because it failed to give the contractually-required notice within 10 days of experiencing the delay, that, even with 84 days of delay, plaintiff still could not have met the contract completion date, and that, even if plaintiff is allowed to claim delay, there is no evidence that it was excusable. Defendant also argues that plaintiff's bad faith claim must fail because there is no evidence of a specific intent to harm plaintiff.

Plaintiff responded and cross-moved for summary judgment that the termination was wrongful. It argues that GSA failed to timely incorporate DIDs by means of a SLA and failed to complete a review of the construction drawings, two duties which it asserts were preconditions to GSA issuing a notice to proceed. The notice to proceed that was issued on August 7, 2007, was thus ineffectual to start the 180-day clock, according to plaintiff. The import of plaintiff's argument is that its duty to proceed under the contract never arose and thus it could not have been in breach when defendant terminated it for default.

In its responsive briefing and at oral argument, defendant contended that plaintiff cannot rest on the contract's original requirements as preconditions to its performance because those requirements were superceded by the mutually agreed upon SLA No. 2, and thus plaintiff waived the ability to insist on rights derived from the original terms of the contract. At oral argument, plaintiff replied to this argument by citing the contract's "no waiver clause," which plaintiff argues has the legal effect of preserving its ability to claim the original contract's provisions requiring a timely DID SLA and review of construction drawings prior to GSA issuing a notice to proceed. After oral argument, the court asked for and received supplemental briefing on the legal effect of the clause.

With respect to its bad faith contention, plaintiff responds that specific intent to injure Lake Charles can be inferred from defendant's pressure on plaintiff in September 2007, in this case and the three related cases, either to enter into a no-cost termination or a too-short construction time line. Plaintiff

alleges for the first time that the real reason GSA terminated the lease was because it no longer desired to have the SSA facility located in the Lake Charles area. Plaintiff cites the depositions of Victor Blackmon, James Barton, and Greg Barton as evidence. Plaintiff believes that the course of dealing and the harsh construction schedule establish a pattern of practice by GSA rising to the level of specific intent to injure Lake Charles.

## DISCUSSION

We have jurisdiction under the Contract Disputes Act to review final decisions of contracting officers. 41 U.S.C. § 7104 (2012). We review them *de novo* as provided in the statute. *Id.* § 7104(b)(4). Summary judgment is appropriate when the record presented shows that there is no genuine issue of material fact in dispute, and thus the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the United States Court of Federal Claims; *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986).

I. Plaintiff's Condition Precedent Argument And The Effect Of The No Waiver Clause

We begin with the question of whether the "no waiver" clause preserved plaintiff's argument that it had no duty to begin or finish construction because GSA's notice to proceed was ineffectual, which plaintiff terms "the condition precedent argument." In other words, plaintiff believes GSA's incorporation of final DIDs in a SLA and review of the construction drawings were preconditions to the government issuing a notice to proceed (from which point the contract's 180-day completion window would begin). Because those things did not happen, the notice to proceed sent on August 7, 2007, had no effect on plaintiff's rights or duties under the contract, per plaintiff.

Defendant counters by pointing to the adoption of the new schedule in SLA No. 2 (November 8, 2007), in which the parties agreed to proceed, with final completion on February 28, 2008. This, according to defendant, supercedes the scheduling requirements of the original terms of the contract, and plaintiff, by signing it, waived any argument based on the original schedule.

Plaintiff replied to that assertion at oral argument by pointing to a clause incorporated by reference into the contract which states:

11

> No failure by either party to insist upon the strict performance of any provision of this lease or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent or other performance by either party during the continuance of any such breach shall constitute a waiver of any such breach of such provision.

48 C.F.R. § 552.270-26 (2014). Thus, in plaintiff's view, its execution of SLA No. 2 could not have waived the right to rely on the government's failure to incorporate DIDs by SLA or perform a final review of construction drawings as a defense to the government's assertion of a lack of progress.

Plaintiff recognizes that no-waiver clauses are themselves generally waiveable, *see, e.g.*, *Wis. Elec. Power Co. v. Union Pac. R.R. Co.*, 557 F.3d 504, 508 (7th Cir. 2009), but it cites the Federal Circuit's decision in *Long Island Savings Bank, FSB v. United States*, as an example of the court's recognition of the enforceability of such clauses in this circuit. 503 F.3d 1234, 1253 (Fed. Cir. 2007). Plaintiff also quotes this court's 2010 decision in *Public Service Co. v. United States*, in which we stated that there was no precedent binding on this court holding that a no-waiver clause could be waived. 91 Fed. Cl. 363, 369 (2010). Plaintiff further argues that 48 C.F.R. § 552.270-26 is required to be included in the contract by law, the import of which, according to plaintiff, is that it had a binding effect on the parties and could not be waived.

The government answers in two ways. Defendant first points out that the Federal Circuit has on two occasions declined to issue a rule that no-waiver clauses are unwaiveable, instead finding that the particular facts of each case did not warrant a knowing waiver in the face of a such a clause. *See Long Island Sav. Bank*, 503 F.3d at 1253; *Westfeld Holdings, Inc. v. United States*, 407 F.3d 1352, 1361 (Fed. Cir. 2005). Defendant also notes language from our decision in *Public Service Co.* wherein we stated that, to the extent those two Federal Circuit cases contemplated the possibility of waiver of no-waiver clauses, they required "strong evidence of implied waiver," something found in neither case. *Pub. Serv. Co.*, 91 Fed. Cl. at 368. Defendant argues that the execution of SLA No. 2 is exactly the sort of strong evidence required to meet the hurdle of proving the waiver of a no-waiver clause.

Defendant's second response to the "no-waiver" argument is based on the terms of the clause itself. Defendant argues that "waiver of any right to insist on a notice to proceed or a supplemental lease incorporating the design

intent drawings does not arise from a failure to insist upon performance of any provision to which this clause in theory might apply." Def.'s Supp. Br. 2. Instead, the waiver results from plaintiff's "affirmative abandonment of any such right." *Id.* at 3. That affirmative abandonment is evidenced by plaintiff's generation of construction drawings and start of construction despite not having a DID-incorporating SLA and the execution of SLA No. 2. Thus the no-waiver clause could, if it has any effect at all, only serve to preserve plaintiff's right to bring a breach claim for the lack of a DID SLA, according to defendant. That, however, could not, in defendant's view, trump the material breach by failure to timely deliver the project. We agree.

The terms of the clause do not operate to prevent a knowing abandonment of a contract right. Plaintiff knew the performance it was owed under the original terms of the contract prior to GSA's issuance of a notice to proceed. It did not receive that performance. Instead, as is often the case in construction contracts, the parties negotiated a new set of performance obligations and amended the contract with SLA No. 2. Plaintiff failed to meet those new obligations and was terminated under the contract's default termination clause. That termination may or may not have been proper depending on the cause of the delay and whether plaintiff met the contract's requirements for asserting that the delay was not its fault. Plaintiff cannot, however, claim that it had no duty to perform when it agreed in writing to a new set of performance obligations which superceded the parties' earlier agreement. In other words, defendant no longer had an obligation to incorporate the DIDs by amendment or review and approve construction drawings prior to issuing a notice to proceed when plaintiff materially breached the contract. In fact, the issuance of a notice to proceed and the contract's 180-day performance period after the notice were no longer of any importance after SLA No. 2. The parties superceded those obligations by agreeing to a wholly new schedule, one that plaintiff did not meet.[9]

---

[9] Plaintiff also contends that the no-waiver clause is a statutory or regulatory requirement. We assume plaintiff's argument is premised on the clause's prefatory language: "As prescribed in 570.703, insert the following clause." 48 C.F.R. § 552.270-18. FAR part 570.703 lists, among others to be included in GSA contracts for leasehold interests, the no-waiver clause. The regulation also provides, however, that the CO may choose not to include any of the listed clauses if he "determines that the clause is not appropriate." 48 C.F.R. § 570.703(a) (2014). We are aware of no legal authority that a clause that may
(continued...)

Further, assuming *arguendo* that the no-waiver clause was not itself waived by plaintiff's agreement to SLA No. 2 or its subsequent conduct, it is inapposite here. The clause states that "no failure by either party to insist upon the strict performance of any provision . . . shall constitute a waiver of any such breach of such provision." 48 C.F.R. § 552.270-26. As defendant points out, by its terms, the clause could only preserve plaintiff's right to assert defendant's alleged failure to furnish DIDs. No court has held that such a provision shields one party from the consequences of its own material breach simply because the other party was guilty of a prior non-material breach. Defendant terminated plaintiff for default after it suffered a total breach. Had defendant not terminated, the no-waiver clause would have preserved the government's right to assert delay damages despite accepting performance after the breach. In this case, however, even if plaintiff retained in theory its right to assert defendants's failure to incorporate DIDs or review construction drawings prior to the issuance of a notice to proceed, such an argument would be moot in light of the parties' subsequent agreement and plaintiff's total breach. The assertion would be of no legal consequence.

II. Plaintiff's Delays Were Not Excused Because Plaintiff Did Not Provide Timely Notice To The Contracting Officer

Because we hold that plaintiff was obligated to perform according to the schedule it agreed to in SLA No. 2, we must now consider whether its failure to perform was excused. We find that it was not.

Plaintiff claims three primary excusable delays: GSA's failure to timely issue and incorporate the DIDs followed by a notice to proceed, delays in obtaining permits due to action or inaction of the state Fire Marshal, and extreme weather (rain). If those delay claims are well-founded, defendant's termination for default may have been improper because Lake Charles' failure to meet the delivery deadline was allegedly not its fault. Defendant challenges plaintiff's delay claims as unfounded because plaintiff failed to notify the CO within 10 days of when they commenced and because plaintiff has not alleged how the delays, even assuming they were not plaintiff's fault, affected the critical path of construction, meaning that they were not the cause of plaintiff's

---

(...continued)
be omitted at the CO's discretion may not later be waived or superceded by subsequent agreement of the parties.

failure to complete the project in time.[10]

In order for delay to be excused, the contract's delay clause requires that "the Lessor within 10 days from the beginning of any such delay (unless extended in writing by the Contracting Officer) provide[] notice to the Contracting Officer of the causes of delay." Def.'s App. 201; 48 C.F.R. § 552.270-18. This means that, if the contractor experiences delay not of its own making, it must provide notice to the CO within 10 days of experiencing the delay or the contractor risks being held responsible for that delay.

Plaintiff does not assert that it provided written notice within 10 days after the beginning of the delay. Instead, it argues that, because GSA did not issue a notice to proceed after incorporation of DIDs by SLA, it had no duty to perform, and thus any delay is the government's fault.

Plaintiff's reliance on the fact that GSA departed from the order of events originally contemplated by the parties is an ineffectual response. At the time, plaintiff did not object to the August 6, 2007 notice to proceed as triggering its duty to complete construction within 180 days. Then on September 19, 2007, plaintiff, through Mr. Blackmon, proposed a new schedule with a February 28, 2008 completion date, plainly ignoring any past duties of the government. That new date was adopted by amendment to the contract in SLA No. 2 on November 8, 2007. The new schedule included a variety of milestones, including permitting deadlines, a concrete pour, and regularly scheduled site inspections by GSA. The adoption of SLA No. 2 was, in effect, a new notice to proceed, and one which ignored defendant's asserted failure to incorporate the DIDs into a SLA and approve plaintiff's construction drawings. Any conditions precedent contemplated under the original schedule

---

[10] We note also that, as this is a CDA claim, plaintiff is limited to a review of the decision of the CO. Although our review of the CO's decision is *de novo*, plaintiff is limited to the facts and arguments it put in front of the CO in its certified claim. *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003). Although that standard does not require "rigid adherence to the exact language" of the claim to the CO, it must be "arise from the same operative facts" and claim "essentially the same relief." *Id.* Delay based on permitting difficulties is not based on the same operative facts as one based on weather or the late issuance of DIDs. Plaintiff did not make a claim to the CO for delay based on permitting delays.

were superceded by SLA No. 2, were no longer in force,[11] and cannot constitute an excuse for plaintiff's failure to give notice of the alleged delay.[12]

We note that neither our predecessor, the Court of Claims, nor the Federal Circuit has had occasion to construe this particular notice provision or the FAR's more general construction contract provision at part 52.249-10. *See R.P. Wallace, Inc. v. United States*, 63 Fed. Cl. 402, 417 (2004). We recognize that the general rule in applying contract notice provisions is that they should be applied liberally. *See generally Hoel-Steffen Constr. Co. v. United States*, 197 Ct. Cl. 561, 573 (1972) (holding that the notice provision of a contract-adjustment clause not be applied "too technically and illiberally where the Government is quite aware of the operative facts") (citing *Copco Steel & Eng'g Co. v. United States*, 169 Ct. Cl. 601, 616 (1965)). The requirement is not meaningless, however, because giving notice within ten days allows an investigation contemporaneous with the events. This comports with the Court of Claim's instruction in *Hoel-Steffen*, where the court declined to construe the contract-adjustment clauses' notice provision strictly against the contractor when the agency was aware of the circumstances due to a request from the contractor for a time-extension under a different contract provision. *Id.*; *see also R.P. Wallace*, 63 Fed. Cl. at 417-18 (rejecting the government's late notice argument because the contractor did not reasonably know of the cause of the delay until seven days before it provided the Navy with notice). In this case, the record does not reflect the government's independent knowledge of

---

[11] As explained earlier, the contract's no-waiver clause could, at most, preserve a claim for damages that plaintiff might have resulting from government-caused delay prior to SLA No. 2, if it was not actually waived by SLA No. 2 and plaintiff's subsequent conduct.

[12] Defendant also argued in its motion for summary judgment that plaintiff's delay claims must be rejected because the alleged delays had no effect on the critical path of construction. This is because they were either endured prior to SLA No. 2, the DID delay, or because the ill weather suffered was almost entirely before plaintiff obtained the necessary city permit to begin vertical construction on March 20, 2008 (3 weeks after the contract's completion date). Although the record appears to support defendant in this regard, we do not reach these issues as they are not necessary to our decision. Plaintiff failed to notify the CO of its delays within the time required by the contract. It therefore bore the risk that, if the project was not substantially completed by the contract-anticipated date, it could be held responsible for that failure.

the problems facing plaintiff or that notice was constructively provided by other means.[13]

In sum, defendant was within its rights to insist on timely notice, and notice was not provided. We hold that plaintiff cannot now assert delay as a defense to non-performance.

III. Plaintiff Cannot Show Bad Faith On The Part Of The Government

Defendant also challenges plaintiff's bad faith claim as doomed to fail because the record does not support any showing of bad faith on the part of GSA or other government personnel. Defendant begins with the law's presumption that government officials act in good faith. *See Road & Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368 (Fed. Cir. 2012). It is a "high burden . . . to overcome this presumption, amounting to clear and convincing evidence to the contrary." *Id.* GSA's actions in administering the contract were consistent with the contract's requirements, which cannot be evidence of bad faith. Furthermore, there is no evidence of a specific intent to injure plaintiff on the part of anyone involved at GSA.

Plaintiff's chief argument is that GSA's attempt to force plaintiff to take a no-cost termination prior to SLA No. 2 evidences bad faith. Plaintiff cites the deposition of Mr. Blackmon, who believes he was "ambushed" at the September 7, 2007 meeting, during which agency officials raised the possibility of termination. *See* Pl.'s Ex. A at 151-57. He believes that this surprise attempt to force a no-cost termination was then used to pressure plaintiff to accept an overly-aggressive new schedule, which was adopted in SLA No. 2. Plaintiff also argues that GSA's actions in all four leases involving Carotex establishes a pattern and practice of bad faith conduct. It points to GSA's cure notices, which, according to Mr. Blackmon, would obligate critical personnel to make a response when they could have been working on project completion. *See id.* at 201-202. Plaintiff also cites an internal government email discussing the Carotex projects and the February 2008 cure notice, which states that GSA was developing "an action plan to put more pressure on Carotex." Pl.'s Ex. J (February 5, 2008 email from Jim

---

[13] The CO, Nancy Lopez, testified that she was unaware of the weather at the location until she received the letters from Mr. Blackmon and Mr. Kimbrough. Pl.'s Ex. C at 23-24 (Dep. of Nancy Lopez). We note also that the GSA office where Ms. Lopez and others worked is located in Forth Worth, TX.

17

Weller, GSA Regional Administrator, to Ramona Schuenmeyer, SSA Regional Administrator).

Plaintiff suggests that GSA had an independent agenda of looking for an excuse to terminate a number of construction contracts for SSA offices. Plaintiff offers the deposition testimony of brothers D. James Barton and Greg Barton, who testified that they, through their company Genesis, attempted to negotiate replacement leases in all four locations in which GSA had terminated contracts with plaintiff or its affiliates. Pl.'s Exs. K & L (Deps. of James and Greg Barton). Those offers were declined by GSA, allegedly because GSA no longer desired SSA offices in those locations. They contend that no offices were ever built in the vicinity of any of the four terminated leases. Plaintiff does not claim that the CO who terminated the contract at issue was aware of these motives, only that she was acting under the direction of superiors at GSA who were pursuing a hidden agenda.

None of these allegations, if credited, would justify a finding that the government operated in bad faith. The record is utterly silent as to any statement by a GSA official indicating a desire to build elsewhere. Nevertheless, even if GSA was not interested in pursuing SSA locations in the places originally selected, the question remains, did it have the right to terminate this contract. If it did, the fact that it made a termination for convenience unnecessary is not proof of ill will or a desire to harm plaintiff.

The GSA internal email chain merely reflects routine contract administration concerns during the early part of 2008 as it became apparent that plaintiff would not meet the delivery date. The agency was acting in its legitimate interest in pressuring plaintiff to perform. Termination was discussed but only as a result of Carotex's inability to deliver the building.

The actions of GSA in suggesting a no-cost termination in September 2007 may have been a surprise to Mr. Blackmon, but that establishes nothing other than his reaction to the suggestion. GSA foresaw problems with the project and offered an exit to plaintiff, which plaintiff chose not to take. That Mr. Blackmon and others at Carotex or Lake Charles felt pressured to accept a short schedule is a reflection of circumstances at the time. The contract was way behind schedule, but plaintiff wanted to proceed, and itself proposed the accelerated schedule which GSA accepted. Nothing in that chain of events rises to the level of bad faith on the part of the government. In short, defendant is entitled to summary judgment on this claim because there is no material fact in dispute with regard to GSA's actions. They were all consistent

with its contract rights.

## CONCLUSION

Defendant has shown that there are no issues of material fact in dispute. Plaintiff's delay claim fails because plaintiff did not present those delays to the CO within 10 days of the start of the delay. Plaintiff does not argue that it provided the required notice or that GSA waived its right to insist upon timely notice. Plaintiff thus had a duty to begin construction and complete it according to the schedule in SLA No. 2. Plaintiff failed to do so. This establishes the propriety of GSA's termination for default. Plaintiff's assertion of bad faith on the part of the government is without merit. Accordingly, defendant's motion for partial summary judgment is granted; plaintiff's cross-motion for partial summary judgment is denied. Entry of judgment is deferred pending resolution of defendant's counterclaim for reprocurement costs and liquidated damages.

                                            s/ Eric G. Bruggink
                                            ERIC G. BRUGGINK
                                            Judge